UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x

Marc MOISE,

                              Plaintiff,                          **COMPLAINT**

                 -v-                                              **JURY TRIAL**
                                                                  **DEMANDED**

The CITY OF NEW YORK; P.O. Gary
CERDA, SHIELD #24307; P.O. "FNUK"                                 Index No.:
LAQUIDARA, SHIELD # 12976; P.O. JOHN                             09 Civ. 9855 (DLC)
DOE, and P.O. DOE II, individually and in
their official capacities, (the names John and
Jane Doe being fictitious, as the true names
and numbers are presently unknown),

                              Defendants.

----------------------------------------------------------x

## PRELIMINARY STATEMENT

1.  This is a civil rights action brought to vindicate the Plaintiff's rights under the First,

    Fifth and Fourteenth Amendments of the Constitution of the United States, under the

    Civil Rights Act, 42 U.S.C. § 1983, and pendant State law claims.

2.  Plaintiff Marc MOISE's rights were violated when officers of the NEW YORK CITY

    POLICE DEPARTMENT unconstitutionally and without any legal basis seized,

    detained, arrested and used gratuitous, unlawful force against the Plaintiff.  By reason

    of Defendants' actions, including their unreasonable and unlawful conduct, search

    and protracted detention, Plaintiff was deprived of his constitutional rights.

3.  Plaintiff also seeks an award of compensatory and punitive damages and attorneys'

    fees.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over federal claims pursuant to 28 U.S.C. §§ 1331, 1343 (3-4). This action is brought pursuant to 42 U.S.C. §§1983 and 1988 and the First, Fifth and Fourteenth Amendments of the Constitution of the United States.

5. Pursuant to New York State General Obligations Law § 50-G, the Plaintiff filed a timely Notice of Claim with the New York City Comptroller on November 28, 2008. Thus, this Court has supplemental jurisdiction over Plaintiff's claims against defendants under the Constitution and laws of the State of New York because they are so related to the within federal claims that they form part of the same case or controversy pursuant to 28 U.S.C. § 1367(a).  Plaintiff's claim was not adjusted by the New York City Comptroller's Office within the period of time provided by statute.

6. Venue is proper pursuant to 28 U.S.C. §1391(b) in that Plaintiff's claim arose in the Southern District of New York.

7. An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. §1988.

## PARTIES

8. Plaintiff MOISE is a resident of New York County in New York State.

9. Defendant, THE CITY OF NEW YORK, is a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a police department which acts as its agent in the area of law enforcement and for which it is ultimately responsible. The Defendant assumes the risks incidental to the maintenance of a police force and the employment of police officers as said risks

attach to the public consumers of the services provided by THE NEW YORK CITY POLICE DEPARTMENT ("NYPD").

10. Defendants P.O. GARY CERDA (shield #24307) (herein "P.O. CERDA"), P.O. "FNUK" LAQUIDARA (shield # 12976) (herein "P.O. LAQUIDARA), P.O. JOHN DOE and P.O. JOHN DOE II (hereinafter, "JOHN DOE" and "JOHN DOE II") and other unidentified police officers (referred to collectively as the "Individual Defendants") are and were at all times relevant herein, officers, employees and agents of the NYPD.  P.O. CERDA, P.O. LAQUIDARA, JOHN DOE and JOHN DOE II are being sued herein in their individual and official capacities.

11. At all times relevant herein, the Individual Defendants were acting under color of state law in the course and scope of their duties and functions as agents, servants, employees and officers of NYPD, and otherwise performed and engaged in conduct incidental to the performance of their lawful functions in the course of their duties. They were acting for and on behalf of the NYPD at all times relevant herein, with the power and authority vested in them as officers, agents and employees of the NYPD and incidental to the lawful pursuit of their duties as officers, employees and agents of the NYPD.

**STATEMENT OF FACTS**

12. The events herein described principally occurred shortly after midnight on September 6, 2008, and afterwards, beginning at a neighborhood barbeque at the Frederick Douglass Houses, located in the vicinity of Amsterdam Avenue, between 102nd and 103rd Street in New York County.

13. Plaintiff MOISE attended the above-mentioned neighborhood barbeque, as did dozens of his neighbors and their friends.

14. Multiple young women began a conversation with Plaintiff MOISE about Plaintiff MOISE's puppies, which he had with him at the barbeque.  After talking for a short time, the young women asked if they could take Plaintiff MOISE's puppies on a walk to the McDonald's restaurant in the vicinity of 105th Street and Broadway.

15. When the young women returned from McDonald's with the puppies, they walked with Plaintiff MOISE towards the interior of the Frederick Douglass Houses in order to bring the puppies back to Plaintiff MOISE's apartment.

16. Before entering the apartment building with the young women, at least one of the young women commented about the people near the barbeque playing dice games and gambling.  Plaintiff MOISE and the young women then entered the apartment building and returned the puppies to Plaintiff MOISE's apartment.

17. When they emerged from the building a short time later, the young women noticed approximately thirty (30) people gathered near the corner of 103rd Street and Amsterdam Avenue.

18. Then, without announcement or explanation, Plaintiff MOISE saw multiple men of average height and build, to wit, P.O. CERDA, P.O. LAQUIDARA, and P.O. JOHN DOE, about thirty (30) to forty (40) feet from him, dressed in plainclothes, running in his direction with their guns drawn and pointed at him.

19. As the men giving chase with guns drawn had not identified themselves as police officers, Plaintiff MOISE became afraid for his life and began running from the Individual Defendants.

20. After a short chase and in fear for his life, Plaintiff MOISE surrendered to P.O. CERDA, P.O. LAQUIDARA, and other of the Individual Defendants giving chase by dropping to his knees and quickly getting to the floor.

21. The Individual Defendants slammed Plaintiff MOISE into the pavement despite his compliance with their orders.

22. One of the Individual Plaintiffs placed handcuffs on the prone Plaintiff MOISE.

23. It was only after Plaintiff MOISE surrendered and was in close proximity to the Individual Defendants and a distinctive white NYPD vehicle that he was able to identify the Individual Defendants as NYPD police officers in plainclothes.

24. Meanwhile, a small crowd of other NYPD officers, to wit, other of the Individual Defendants, began gathering around the area where Plaintiff MOISE was being detained.

25. In the moments immediately following the chase and surrender, Plaintiff MOISE asked the Individual Defendants why he was being detained.

26. In response, approximately four (4) of the Individual Defendants began kicking and stomping Plaintiff MOISE on his ribs, legs and arms, even while his hands were cuffed behind his back and while he was complying with their orders.

27. Plaintiff MOISE attempted to shield his face from the Individual Defendants' kicks and stomps by attempting to maneuver his body under the nearby NYPD squad car.

28. Upon observing the beating of Plaintiff MOISE by the Individual Defendants, several of the neighbors noticed what was happening and began taking pictures of the beating with the cameras on their cellular phones.

29. In response to seeing bystanders taking pictures of the beating, the Individual
Defendants picked Plaintiff MOISE off of the grounds and threw him the back of the
NYPD squad car.  During this time, one of the Individual Defendants stated, in sum
and substance and directed at the bystanders with cameras: "Don't worry.  We'll fuck
him up at the precinct."

30. While Plaintiff MOISE was in the squad car, one of the Individual Defendants kept
the car door open and proceeded to beat the handcuffed Plaintiff MOISE with an
ASP, an expandable metal baton, while another of the Individual Defendants applied
Mace to Plaintiff MOISE's eyes while he was detained, restrained, and helpless.

31. Thereafter, the Individual Defendants transported Plaintiff MOISE to the 24th
Precinct, located at 151 West 100th Street.

32. While at the 24th Precinct, at least one (1) of the Individual Defendants slammed
Plaintiff MOISE's head into a wall, causing Plaintiff MOISE to fall to the floor.

33. Immediately thereafter, one of the Individual Defendants dug his knee into Plaintiff
MOISE's back and twisted Plaintiff's MOISE's arm behind his body, all while
Plaintiff MOISE was prone and cooperative.

34. The concussion to Plaintiff MOISE's head caused him to lose consciousness.

35. Plaintiff MOISE re-gained consciousness while being transported to St. Luke's
Hospital in an ambulance.  In the ambulance, Plaintiff MOISE noticed that his upper
right facial cheek was split open and bleeding, eventually requiring multiple stitches
to close the wound.

36. In sum, Plaintiff MOISE's wounds included, inter alia, bruising and swelling to the
right side of his face necessitating stitches below his right eye brow, as well as

multiple cuts and deep scrapes on his elbows and his right knee and temporarily

debilitating back pain.

37. Inexplicably, Plaintiff MOISE was arraigned on two (2) counts of robbery in the

second degree, N.Y.P.L. §§ 160.10(1) and 160.10(2), and assault in the second

degree, N.Y.P.L. § 120.05(3).  Plaintiff pled not guilty at arraignment.

38. The case arising from the above-described events was terminated in favor of Plaintiff

MOISE.

39. At the time of the incident, Plaintiff MOISE was serving a term of post-release

supervision (herein "PRS").  Plaintiff MOISE's unlawful arrest at hands of the

Individual Defendants directly caused Plaintiff MOISE to be placed on parole hold

for purportedly violating the terms of his PRS.

40. Plaintiff MOISE remained incarcerated in the Defendants' custody, primarily at the

Metropolitan Detention Complex, until he was released on April 7, 2009.  Thus, he

was wrongfully detained for over seven (7) months.

41. As a result of his wrongful and prolonged detention, Plaintiff MOISE was terminated

from his job from Lekker Stuk LLC d/b/a Your Asian Food Co.

42. Plaintiff MOISE also missed a semester of college at the City University of New

York – Lehman College due to his incarceration.

43. Moreover, during his prolonged detention, Plaintiff MOISE incurred the following

costs: approximately $5,000 to be bailed out of jail, approximately $4,000 for an

attorney, and approximately $2,000 to $3,000 in the commissary.

**FIRST CLAIM**
**DEPRIVATION OF RIGHTS UNDER THE**
**UNITED STATES CONSTITUTION AND 42 U.S.C. §1983**

44. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

45. Defendants, under color of state law, subjected the plaintiff to the foregoing acts and omissions without due process of law and in violation of 42 U.S.C. § 1983, thereby depriving plaintiff of his rights, privileges and immunities secured by the Fourth, Fifth and Fourteenth Amendments to the United States Constitution, including, without limitation, deprivation of the following constitutional rights:

a.      Freedom from unreasonable seizure of her person, including the excessive use of force;

b.      Freedom from arrest without probable cause;

c.      Freedom from false imprisonment, meaning wrongful detention without good faith, reasonable suspicion or legal justification, and of which plaintiffs were aware and did not consent;

d.      Freedom from the lodging of false charges against each of them by police;

e.      Freedom from malicious prosecution by police, that being prosecution without probable cause that is instituted with malice and that ultimately terminated in plaintiff's favor;

f.      Freedom from abuse of process;

g.      Freedom from deprivation of liberty without due process of law;

> h.     The enjoyment of equal protection, privileges and immunities under the laws; and
>
> i.     Freedom from malicious prosecution.

46. Defendants' deprivation of plaintiff's constitutional rights resulted in the injuries and damages set forth above.

## SECOND CLAIM
## SUPERVISORY LIABILITY FOR DEPRIVATION OF RIGHTS UNDER THE UNITED STATES CONSTITUTION AND 42 U.S.C. §1983

47. Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

48. By failing to remedy the wrongs committed by his or her subordinates, and in failing to properly train, screen, supervise, or discipline his or her subordinates, supervisory officer JOHN DOE II caused damage and injury in violation of Plaintiff's rights guaranteed under 42 U.S.C. §1983, and the United States Constitution, including its First, Fourth, Fifth and Fourteenth Amendments.

49. As a result of the foregoing, Plaintiff was deprived of his liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

## THIRD CAUSE OF ACTION
## (Failure to Intervene – Fourth Amendment – 42 U.S.C. § 1983)

50. Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

51. Members of the NYPD have an affirmative duty to assess the constitutionality of interactions between their fellow members of service and civilians and to intervene where they observe another member of the Police Department or other law

enforcement agency employing unjustified and excessive force against a civilian or falsely arresting a civilian.

52. Defendant JOHN DOE II was present for the above-described incident and witnessed other defendants, to wit, P.O. CERDA, P.O. LAQUIDARA, and JOHN DOE unlawfully arrest the Plaintiff.

53. Defendants' use of force against plaintiff was obviously excessive and unjustified under the circumstances yet defendant JOHN DOE II failed to take any action or make any effort to intervene, halt or protect the Plaintiff from being subjected to excessive force by other Individual Defendants.

54. The arrest of Plaintiff and the initiation of criminal charges against him was clearly without probable cause or other legal justification, and was based on facts alleged by defendants P.O. CERDA and P.O. LAQUIDARA which defendant JOHN DOE II knew to be false, yet defendant JOHN DOE II failed to take any action or make any effort to intervene, halt or protect Plaintiff from being unlawfully and wrongfully arrested and prosecuted.

55. Defendant JOHN DOE II's violations of Plaintiff's constitutional rights by failing to intervene in other defendants' clearly unconstitutional use of force and Plaintiff's unconstitutional arrest resulted in the injuries and damages set forth above.

## FOURTH CAUSE OF ACTION
### (Monell Claim Against Defendant CITY- 42 U.S.C. § 1983)

56. Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

57. All of the acts and omissions by the named and unnamed individual police officer defendants described above were carried out pursuant to overlapping policies and

practices of the CITY OF NEW YORK which were in existence at the time of the conduct alleged herein and were engaged in with the full knowledge, consent, and cooperation and under the supervisory authority of the defendant CITY and its agency, the NYPD.

58. Defendant CITY and the NYPD, by their policy-making agents, servants and employees, authorized, sanctioned and/or ratified the individual police defendants' wrongful acts; and/or failed to prevent or stop those acts; and/or allowed or encouraged those acts to continue.

59. The actions of the individual police defendants resulted from and were taken pursuant to the following *de facto* policies and/or well-settled and widespread customs and practices of the CITY, which are implemented by members of the police department, of employing wholly unprovoked and excessive force.

60. The actions of the individual police defendants resulted from and were taken pursuant to the following *de facto* policies and/or well-settled and widespread customs and practices of the CITY, which are implemented by members of the police department, of engaging in systemic and ubiquitous perjury, both oral and written, to cover-up constitutional and state law violations committed against civilians by either themselves or their fellow officers, supervisors and/or subordinates.  They do so with the knowledge and approval of their supervisors, commanders and Police Commissioner RAYMOND KELLY ("KELLY") who all: (i) tacitly accept and encourage a code of silence wherein police officers refuse to report other officers' misconduct or tell false and/or incomplete stories, *inter alia*, in sworn testimony, official reports, in statements to the Civilian Complaint Review Board ("CCRB") and

the Internal Affairs Bureau ("IAB"), and in public statements designed to cover for and/or falsely exonerate accused police officers; and (ii) encourage and, in the absence of video evidence blatantly exposing the officers' perjury, fail to discipline officers for "testilying" and/or fabricating false evidence to initiate and continue the malicious prosecution of civilians in order to cover-up civil rights violations perpetrated by themselves or fellow officers, supervisors and/or subordinates against those civilians.

61. The existence of the foregoing unlawful *de facto* policies and/or well-settled and widespread customs and practices is known to, encouraged and/or condoned by supervisory and policy-making officers and officials of the NYPD and the CITY, including, without limitation Commissioner KELLY.

62. Despite knowledge of such unlawful *de facto* policies, practices and/or customs, these supervisory and policy-making officers and officials of the NYPD and the CITY, including Commissioner KELLY, have not taken steps to terminate these policies, practices and/or customs, do not discipline individuals who engage in such polices, practices and/or customs, or otherwise properly train police officers with regard to the constitutional and statutory limits on the exercise of their authority, and instead sanction and ratify these policies, practices and/or customs through their active encouragement of, deliberate indifference to and/or reckless disregard of the effect of said policies, practices and/or customs upon the constitutional rights of persons in the City of New York.

63. The aforementioned CITY policies, practices and/or customs of failing to supervise, train, instruct and discipline police officers and encouraging their misconduct are

evidenced by the police misconduct detailed herein.  Specifically, pursuant to the
aforementioned CITY policies, practices and/or customs, the Individual Defendants
felt empowered to exercise unreasonable and wholly unprovoked force against
plaintiff, arrest plaintiff without probable cause and then fabricate and swear to a false
story to cover up his blatant violation of plaintiff's constitutional rights.  Pursuant to
the aforementioned CITY policies, practices and/or customs, defendants to intervene
in or report other defendants' violation of plaintiff's rights or subsequent perjury.

64. The aforementioned CITY policies, practices and/or customs of failing to supervise,
train, instruct and discipline police officers and encouraging their misconduct are
further evidenced, *inter alia*, by the following:

65. Plaintiff's injuries were a direct and proximate result of the defendant CITY and its
agency, the NYPD's, wrongful *de facto* policies and/or well-settled and widespread
customs and practices and of the knowing and repeated failure of the defendant CITY
and the NYPD to properly supervise, train and discipline their police officers.

    A.  The Report of the Commission to Investigate Allegations of Police
       Corruption and the Anti-Corruption Procedures of the Police Department
       ("Mollen Commission Report"), dated July 7, 1994, states:

        In the face of this problem [of corruption], the [New York City Police]
        Department allowed its systems for fighting corruption virtually to
        collapse.  It has become more concerned about the bad publicity that
        corruption disclosures generate than the devastating consequences of
        corruption itself.  As a result, its corruption controls minimized, ignored
        and at times concealed corruption rather than root it out.  Such an

institutional reluctance to uncover corruption is not surprising.  No
institution wants its reputation tainted – especially a Department that
needs the public's confidence and partnership to be effective.  A weak
and poorly resourced anti-corruption apparatus minimizes the likelihood
of such taint, embarrassment and potential harm to careers.  Thus there is
a strong institutional incentive to allow corruption efforts to fray and lose
priority – which is exactly what this Commission uncovered.  This
reluctance manifested itself in every component of the Department's
corruption controls from command accountability and supervision, to
investigations, police culture, training and recruitment.

For at least the past decade, the system designed to protect the
Department from corruption minimized the likelihood of uncovering it.
Mollen Commission Report, pp. 2-3.

B.  Accordingly, in 1990, the Office of Special Prosecutor, which investigated
charges of police corruption, was abolished.

C.  The Mollen Commission concluded that police perjury and falsification of
official records is probably the most common form of police corruption
facing the criminal justice system . . . .

. . . Regardless of the motives behind police falsifications, what is
particularly troublesome about this practice is that it is widely tolerated by
corrupt and honest officers alike, as well as their supervisors.  Corrupt and
honest officers told us that their supervisors knew or should have known

about falsified versions of searches and arrests and never questioned

them.

. . . What breeds this tolerance is a deep-rooted perception among many

officers of all ranks within the Department that nothing is really wrong

with compromising facts to fight crime in the real world.  Simply put,

despite the devastating consequences of police falsifications, there is a

persistent belief among many officers that it is necessary and justified,

even if unlawful.  As one dedicated officer put it, police officers often

view falsification as, to use his words, "doing God's work" – doing

whatever it takes to get a suspected criminal off the streets.  This attitude

is so entrenched, especially in high-crime precincts, that when

investigators confronted one recently arrested officer with evidence of

perjury, he asked in disbelief, "What's wrong with that?  They're

guilty."

Mollen Commission Report, pp. 36, 40-41.

D.  Significant evidence of perjured sworn statements systemically provided

by officers to attempt to cover-up or justify unlawful mass arrests of 1800

people has been and continues to be developed in the consolidated

litigation arising out of the 2004 Republican National Convention.  *See,*

*e.g.*, Second Amended Class Action Complaint in *MacNamara, et al. v.*

*City of New York, et al.*, 04-CV-9216 (SDNY) at ¶¶ 73(G) - (I), 102, 107,

112, 119, 124, 129, 143, 158, etc., 228, 232, 240, 259; *see also Long v.*

*City of New York*, 09-Civ.-6099 (SDNY) (officer prosecuted for perjury).

E.   New York County District Attorney Robert Morgenthau has been quoted as acknowledging that in the NYPD there is a "code of silence," or a "code of protection" that exists among officers and that is followed carefully.

F.   In 1985, former Police Commissioner Benjamin Ward, testifying before a State Senate Committee, acknowledged the existence of the "code of silence" in the NYPD.

G.   Former New York City Police Commissioner Robert Daly wrote in 1991 that the "blue wall of solidarity with its macho mores and prejudices, its cover-ups and silence, is reinforced every day in every way."

H.   Regarding defendant CITY's tacit condonement and failure to supervise, discipline or provide remedial training when officers engage in excessive force, the Civilian Complaint Review Board is a City agency, allegedly independent from the NYPD, that is responsible for investigating and issuing findings on complaints of police abuse of civilians.  It is rare that the CCRB substantiates an allegation of police misconduct.[1]  When it does, however, Police Commissioner KELLY controls whether the NYPD pursues the matter and he alone has authority to impose discipline on the subject officer(s).  Since 2005, during KELLY's tenure, only one-quarter

---

[1]        In 2006, out of more than 10,000 allegations that were fully investigated, the CCRB substantiated only 594 (about 6%).  In 2007, out of more than 11,000 allegations that were fully investigated, the CCRB substantiated only 507 (about 5%).  See CCRB Jan-Dec. 2007 Status Report at p. 19, available at http://www.nyc.gov/html/ccrb/pdf/ccrbann2007_A.pdf.  Upon information and belief, the low rate of substantiated complaints is due in part to the above-noted de facto policy and/or well-settled and widespread custom and practice in the NYPD whereby police officers refuse to report other officers' misconduct or tell false and/or incomplete stories, inter alia, in sworn testimony and statements given to the CCRB, to cover-up civil rights violations perpetrated by themselves or fellow officers, supervisors and/or subordinates.

of officers whom the CCRB found engaged in misconduct received

punishment more severe than verbal "instructions."  Moreover, the

number of CCRB-substantiated cases that the NYPD has simply dropped

(*i.e.*, closed without action or discipline) spiked from less than 4% each

year between 2002 and 2006, to 35% in 2007, and 30% so far in 2008.  As

a result, the percentage of cases where the CCRB found misconduct but

where the subject officers were given only verbal instructions or the

matter was simply dropped by the NYPD rose to 66% in 2007.

Substantiated complaints of excessive force against civilians accounted for

more than 10% of the cases that the NYPD dropped in 2007 and account

for more than 25% of cases dropped in 2008.  *See* 8/20/08 *Daily News*

Editorial, "City leaders must get serious about policing the police."

66. Plaintiff's injuries were a direct and proximate result of the defendant CITY and its

agency, the NYPD's, wrongful *de facto* policies and/or well-settled and widespread

customs and practices and of the knowing and repeated failure of the defendant CITY

and the NYPD to properly supervise, train and discipline their police officers.

67. Defendant CITY knew or should have known that the acts alleged herein would

deprive plaintiff of his rights, in violation of the First, Fourth, Fifth and Fourteenth

Amendments to the United States Constitution and Article 1, §§ 6, 8, 11, and 12 of

the Constitution of the State of New York.

68. Defendant CITY is directly liable and responsible for the acts of the individual police

defendants because it repeatedly and knowingly failed to properly supervise, train,

instruct, and discipline them and because it repeatedly and knowingly failed to

enforce the rules and regulations of the NYPD, and to require compliance with the

constitutions and laws of the State of New York and the United States.

**FIFTH CLAIM**
**RESPONDEAT SUPERIOR LIABILITY OF THE CITY OF NEW YORK FOR**
**STATE LAW VIOLATIONS**

69. Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs

as if fully set forth herein.

70. The conduct of defendant JOHN DOE alleged herein, occurred while he or she was

on duty and in uniform, and/or in and during the course and scope of his or her duties

and functions as New York City POLICE OFFICERS, and/or while he or she was

acting as an agent and employee of defendant THE CITY OF NEW YORK, clothed

with and/or invoking state power and/or authority, and, as a result, defendant THE

CITY OF NEW YORK is liable to Plaintiff pursuant to the state common law

doctrine of respondeat superior.

71. As a result of the foregoing, Plaintiff was deprived of his liberty, suffered specific and

serious bodily injury, pain and suffering, psychological and emotional injury, costs

and expenses, and was otherwise damaged and injured.

**SIXTH CLAIM**
**(ASSAULT AND BATTERY)**

72. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs

as if fully set forth herein.

73. By the actions described above, defendants did inflict assault and battery upon

Plaintiff.  The acts and conduct of defendants were the direct and proximate cause of

injury and damage to Plaintiffs and violated his statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

74. As a result of the foregoing, Plaintiff was deprived of their liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

## SEVENTH CLAIM
## (FALSE ARREST and FALSE IMPRISONMENT)

75. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

76. By the actions described above, defendants caused to be falsely arrested or falsely arrested Plaintiff, without reasonable or probable cause, illegally and without a warrant, and without any right or authority to do so.  The acts and conduct of the defendants were the direct and proximate cause of injury and damage to Plaintiff and violated his statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

77. As a result of the foregoing, Plaintiff was deprived of his liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

## EIGHTH CAUSE OF ACTION
## (ABUSE OF PROCESS)

78. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

79. By the conduct and actions described above, defendants employed regularly issued process against Plaintiff compelling the performance or forbearance of prescribed

acts.  The purpose of activating the process was intent to harm Plaintiff without economic or social excuse or justification, and the defendants were seeking a collateral advantage or corresponding detriment to Plaintiff which was outside the legitimate ends of the process.  The acts and conduct of the defendants were the direct and proximate cause of injury and damage to Plaintiff and violated his statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

80. As a result of the foregoing, Plaintiff was deprived of his liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

**NINTH CAUSE OF ACTION**
**(INTENTIONAL and NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS)**

81. The Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

82. By the actions described above, defendants engaged in extreme and outrageous conduct, which intentionally and/or negligently caused severe emotional distress to Plaintiff.  The acts and conduct of the defendants were the direct and proximate cause of injury and damage to Plaintiff and violated his statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

83. As a result of the foregoing, Plaintiff was deprived of his liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, great humiliation, costs and expenses, and was otherwise damaged and injured.

**TENTH CAUSE OF ACTION**
**(VIOLATION OF RIGHT TO EQUAL PROTECTION OF LAW)**

84. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

85. By the actions described above, defendants violated Plaintiff's right to equal protection of law.  The acts and conduct of the defendants were the direct and proximate cause of injury and damage to Plaintiffs and violated their statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

**ELEVENTH CAUSE OF ACTION**
**(NEGLIGENCE)**

86. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

87. The defendants, jointly and severally, negligently caused injuries, emotional distress and damage to Plaintiff.  The acts and conduct of the defendants were the direct and proximate cause of injury and damage to the Plaintiff and violated his statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

88. As a result of the foregoing, Plaintiffs was deprived of their liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

**TWELFTH CAUSE OF ACTION**
**(NEGLIGENT HIRING, SCREENING, RETENTION,**
**SUPERVISION, AND TRAINING)**

89. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

90. Defendant THE CITY OF NEW YORK negligently hired, screened, retained, supervised, and trained defendants.  The acts and conduct of the defendants were the direct and proximate cause of injury and damage to Plaintiff and violated his statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

91. As a result of the foregoing, Plaintiff was deprived of his liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

WHEREFORE, Plaintiff demands judgment against the defendants individually and jointly and prays for relief as follows:

a. That he be compensated for violation of his constitutional rights, pain, suffering, mental anguish, and humiliation; and

b. That he be awarded punitive damages against the individual defendants; and

c. That he be compensated for attorneys' fees and the costs and disbursements of this action; and

d. For such other further and different relief as to the Court may seem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury in this action on each and every one of his damage claims.

Dated:   New York, New York
         December 1, 2009

Respectfully Submitted,


By:    _____/s_____
        David B. Rankin (DR 0863)
        Rankin & Taylor, Attorneys at Law
        *Attorneys for Plaintiff*
        350 Broadway, Suite 700
        New York, NY 10013
        t: 212-226-4507